## SPRUNT et al. v. HURST–STREATOR CO.

(Circuit Court, D. South Carolina. March 2, 1910.)

GAMING (§ 12*)—CONTRACTS FOR FUTURE DELIVERY.

> Where, at the time cotton was sold for future delivery, it was the intention of the parties to actually deliver and receive the cotton, the fact that the purchaser, on being unable to get the actual cotton, accepted a payment in cash, did not render the transaction a gambling one.
>
> [Ed. Note.—For other cases, see Gaming, Cent. Dig. § 22; Dec. Dig. § 12.*]

At Law. Action by Alexander Sprunt and another against the Hurst-Streator Company. On motion to direct a verdict for plaintiffs. Motion granted.

Stevenson & Matheson and Edward McIver, for plaintiffs.
W. P. Pollock, for defendant.

BRAWLEY, District Judge. I think that the case of Springs v. Carpenter, reported in 154 Fed. 487, 83 C. C. A. 327, is conclusive as to my duty in this case. There is a motion on behalf of the defendants that the court direct a verdict in favor of the defendants in the cause of action, and that it should further direct a verdict in favor of the defendants for the sum of $1,687.50, the amount paid in money on the 25th of October. The case of Springs v. Carpenter was tried before me at Greenville. It arose out of a transaction on the New York Cotton Exchange. I was of the opinion then, and my opinion

has not changed since, that 9 out of 10, I may say 99 out of 100, of the transactions upon the New York Cotton Exchange are gambling contracts; that they are nothing more than wagers upon the future price of cotton, and although in form, by the rules of the New York Cotton Exchange, there was an agreement actually to deliver and actually to receive the cotton, yet as a matter of fact I do not believe that in 1 case out of 100 there was ever an intention to receive or to deliver actual cotton. Consequently I left that question for the jury to say whether it believed there was an actual, bona fide intention to deliver cotton; and the jury found in that case, and I think properly found, that there was no such bona fide selling and buying of actual cotton, and that it was a wagering contract, void at common law, void under the very stringent statute of South Carolina. I am in thorough sympathy with the object of that legislation, and would, so far as I could, do what Chief Justice McIver said was the intention of the legislation in this case, uproot this gambling in future contracts. That case was carried to the Court of Appeals, and the facts in it are much stronger on the side of the defendant than any of the facts proved in this case, and the Court of Appeals decided that it was the duty of the court, on the testimony in that case, to direct a verdict for the plaintiff.

Now, this suit here is on a contract of May 17, 1909, between the Hurst-Streator Company on the one part, and Alexander Sprunt & Son on the other part. The testimony is, and it is a matter of notoriety, even without testimony to satisfy me of the truth of it, that Alexander Sprunt & Son are large dealers in actual cotton in the city of Wilmington, which is probably the nearest port to Cheraw in the state of South Carolina; that they were buyers and exporters of cotton in large amounts; that they had their agents all through this country, who bought cotton for them, and made contracts for them for future delivery of cotton. There is nothing in the law of South Carolina, and there is no law anywhere that I know of, which makes illegal or immoral transactions of the kind set forth in this contract. A contract for the future delivery of cotton is as valid as any other contract, provided it is a bona fide contract, and if the parties intend on the one part to buy, and on the other part to sell and to deliver, the actual cotton. Now, on its face, and in all the circumstances which have been detailed in the testimony, there is not a doubt in my mind that this was a bona fide transaction; that Sprunt & Son intended to buy, and that Hurst-Streator Company, who were dealers in cotton, intended to sell, and that they intended actually to deliver, the 300 bales of cotton mentioned in this agreement. The same is true as to the other two contracts, 100 bales each, one dated in May, and the other in June. There is testimony as to what occurred at the time when the contracts were entered into. Certain changes, certain interlineations, were made in the printed form of the contract at the suggestion of the defendant here, Hurst; and those interlineations were made by E. H. Duval, who was the clerk of his father, M. W. Duval, the agent of Sprunt & Son. Those interlineations were approved by Sprunt & Son, through their agent, M. W. Duval. All of them tend

to confirm what appears upon the face of the printed form of the contract, that there was an expectation at the time on the part of the defendants, Hurst-Streator Company, to deliver the actual cotton. Later, in the autumn of that year, in September and October, actual cotton was delivered in conformity with this contract to the extent of about 115 bales. A little later still, according to the testimony, the agent of Sprunt & Son called upon Hurst-Streator Company to deliver more cotton to them, actual cotton. He was informed by the defendants that they had the cotton on hand, mixed up with other cotton, and that it would take some time to separate it; and this agent of the plaintiff went to Chesterfield, to the defendants, talked with them about the cotton which was in the yards of the defendants, and endeavored to secure the 100 bales that he had been informed was on hand, and offered to assist in having it delivered to the railroad station in accordance with his contract, but some days elapsed before that was accomplished, and at the request of the defendants, acquiesced in by Duval, the agent of the plaintiffs, a settlement for that 100 bales was made in money, and $1,687.50 was paid on that account. It was for the money so paid that this counterclaim was set up, and the court is asked to direct a verdict in favor of the defendants for that amount.

The court must refuse to give such direction. It would not hesitate to direct a verdict for that amount if it believed that this was, which is contended for by defendants, a gambling transaction; but believing, as it does, that it was the bona fide intention of the parties, at the time the contract was made, to deliver the cotton, the actual cotton, the mere fact that the plaintiffs, after that time, late in October, after vainly endeavoring to obtain the actual cotton, failing to receive it, accepted payment in cash, does not throw any light upon what the intention of the parties was at the time the contract was entered into. What was the intention of the parties at the time, then, must govern, and if they intended then—that is, on May 17th—a bona fide transaction, if it was the intention then on the part of the defendants to deliver, and on the part of the plaintiffs to receive, actual cotton, as expressed in this contract, then it does not vitiate it because afterwards, when they were unable to get the actual cotton, they accepted payment in cash. It would be otherwise if in the inception there was any evidence that this was a mere gambling transaction. I believed in the case of Springs v. Carpenter that that was a gambling transaction; but in that case the court held that, notwithstanding the defendants' claim, it was a gambling transaction, there was no evidence sufficient to go to the jury to establish the invalidity of the contract, and therefore it was the duty of the court to direct a verdict.

Now, if there was any conflict of testimony, if there was any room for a reasonable doubt, as to what this contract was, I should prefer to submit that question to the jury, and upon the inception of the case that was the inclination of my mind, to let the jury decide whether this was a bona fide transaction, or whether it was a gambling contract; but reviewing the testimony, endeavoring to recall all that was said and all that was done, I cannot see that there can be any other than one conclusion.

Feeling that it would be my duty to set aside the verdict if the jury should find in favor of the defendants, which I doubt that it would, but, if it did, it would be my duty to set it aside, I feel that it is my duty to direct the foreman to find a verdict for the plaintiffs for the amount claimed.

Defendants note exception to the court's refusal to direct a verdict for the defendants, and also to its granting the motion to direct a verdict for the plaintiffs. Case settled. No appeal taken.